**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Jeanette Spangler, *et al*,

        Plaintiffs,

     v.                          Case No. 1:06cv229

Dwayne Wenninger, *et al*,              Judge Michael R. Barrett

        Defendants.

### OPINION & ORDER

This matter is before the Court upon Defendants Clermont County Board of Commissioners, A.J. Rodenberg, Jr.'s Motion for Summary Judgment (Doc. 70); and Defendants Brown County Board of Commissioners, Dwayne Wenninger's Motion for Summary Judgment (Doc. 81). Plaintiffs filed a combined Response to Defendants' Motions (Docs. 97), and Defendants filed Replies. (Docs. 105, 106)

## I.    BACKGROUND

This case arises out of the search for a missing woman. Even though a body was never found, a man was convicted for her kidnaping and aggravated murder in 1997.

In 2004, Mark Penn, who was at that time a deputy in the Clermont County Sheriff's Office, received tips from Joe "Doughnut" Woods and another informant,[1] that the body of the missing woman could be found near or under a pole barn at 21962 Fayetteville-Blanchester Rd., Blanchester, Ohio. (Doc. 72, Mark Penn Depo. at 9) This property is located in Brown County and is owned by Plaintiff Jeanette Spangler. (Doc. 74,

---

[1]Penn was unable to remember the name of the second informant in his deposition. (Penn Depo. at 38)

Jeanette Spangler Depo. (6/13/07) at 23-24) Spangler has never lived on the property, but her son, Plaintff Jerrod Messer, lived there until 2003, when he was incarcerated on unrelated charges. (Spangler Depo. (6/13/07) at 26; Doc. 73, Jarrod Messer Depo. at 13) While incarcerated, Messer stored his supplies, tools and equipment for his roofing and construction business in the pole barn. (Spangler Depo. (6/13/07) at 35, 55-87, 169-175) Messer also stored vehicles there for reconstruction. (Id.)

Penn met with Woods, who informed him that Messer had paid him to provide a backhoe to bury the body of the missing woman. (Penn Depo. at 10) Penn considered Woods reliable based on information provided to him from the Clermont County drug unit and the Clinton County Sheriff. (Id. 11, 13, 14) Penn met with Woods several times, and on one occasion, Woods took Penn to the property at 21962 Fayetteville-Blanchester Rd. (Id. at 20) Woods was able to provide Penn with information about the crime which had not been released to anyone outside law enforcement. (Id. at 41)

On April 27, 2007, Penn met with officers in the Brown County Sheriff's Office: Captain Barry Creighton, Chief Deputy John Dunn, and Sergeant John Schadle. (Id. at 31) After hearing the facts of Penn's investigation, a deputy from Brown County assisted Penn in preparing a search warrant and his affidavit to ensure it was in the proper format for Brown County. (Id. at 184-85; Doc. 77, John Dunn Depo., Ex. 5) Penn was then accompanied by Creighton to Brown County Judge Thomas Zackman's courtroom to obtain a search warrant. (Penn Depo., at 212; Dunn Depo. at 23-24) Judge Zachman issued the warrant, which states:

> WHEREAS there has been filed with me an Affidavit, a copy of which is attached hereto and incorporated herein, the County aforesaid, and they are hereby commanded to go to the afore described premises, the Jarrod

Messer property, located at 21962 Fayetteville-Blanchester Rd, Blanchester, Brown County, Ohio, said property to include the un-attached garage building setting to the rear of the residence, and the area surrounding said garage as well as all grounds on said premises, in the County aforesaid, and there diligently search for a body, body parts, or any human remains, including but not limited to blood, hair, skin, bones, or any clothing or other articles relevant to a site where a body had been disposed of.

Penn contacted the FBI to gain their assistance in the execution of the warrant. (Dunn Depo. at 26)  The FBI agreed to assist with the search. (Penn Depo. at 189-90) Special Agent Stephen Grieger from the FBI was present almost every day of the search. (See Dunn Depo., Exhibit 2).

Penn contacted Spangler by phone and in person to give her a copy of the search warrant.  (Penn Depo. at 93, 185-186; Dunn Depo. at 224)  Spangler disputes that she received a copy of the search warrant before the search began.  (Spangler Depo. (6/13/07) at 39)

Because the property was located in Brown County, Dunn was in charge of the search.  (Penn Depo. at 74; Dunn Depo. at 36)  The only times Dunn was not in charge was when Defendant Dwayne Wenninger, the Brown County Sheriff, was on the property. (Dunn Depo. at 55, 123)  Sheriff  Wenninger was on site on six separate occasions and, many of those times was there to help with the actual digging.  (Dunn Depo. at 123-25; Doc. 78, Dwayne Wenninger Depo., Ex. 2)  When Dunn and Wenninger were absent, Penn was in charge of the site.  (Dunn Depo. at 127; Wenninger Depo. at 26)  Defendant A.J. Rodenberg, the Clermont County Sheriff, testified that he had a "general" awareness of the search.  (Doc. 71, A.J. Rodenberg, Jr. Depo. at 25)  Sheriff Rodenberg was at the site on May 5, 2004 for about ninety minutes to survey the progress of the search, but he was not involved in the search itself.  (Id. at 60)  In addition, Clermont County paid half of

the cost of equipment used in the search.  (Dunn Depo. at 187)

The search began with the FBI drilling holes in the concrete floor of the pole barn. (Doc. 79, Stephen Grieger Depo., at 49–50)  Cadaver dogs were then brought in to determine where to dig.  (Grieger Depo. at 55-56; Dunn Depo. at 30-31; Penn Depo. at 203-204)  Multiple cadaver dogs were brought in on several occasions, one at a time, to search the area both inside and around the pole barn.  (Dunn Depo., at 46, 69, 95, 100-101; Wenninger Depo. at 64)  Dunn ensured that the cadaver dogs used were trained solely to search for cadavers, not multiple types of evidence such as drugs and cadavers. (Dunn Depo. at 12)

Dunn and the other law enforcement personnel started to remove some of the personal property stored inside the pole barn.  (Dunn Depo. at 47-48; Grieger Depo. at 54) Penn contacted Spangler about the property.  (Penn Depo. at 93)  Penn testified that Spanger told him that she wanted nothing to do with her son's property and did not care what happened to it.  (Id.)  Dunn contacted a tow truck service to move the vehicles that were inside the pole barn to the front of the property.  (Dunn Depo. at 189)  The remaining property inside the pole barn was moved to the sides of the building.  (Penn Depo. at 227)

The officers began to remove concrete in the area where the dogs had picked up scent.  (Dunn Depo. at 48)  By May 1, 2004, the cadaver dogs had hit on even more areas within the pole barn, causing law enforcement to remove the remaining personal property. (Dunn Depo. at 48; Penn Depo. at 118-19)  Either Sheriff Wenninger or Dunn decided where to move the property.  (Wenninger Depo. at 55)  Penn testified that some efforts were made to protect some of the property by storing it inside the  vehicles on the property. (Penn Depo. at 105)  However, Dunn and Wenninger testified that they considered the

property left outside the pole barn to be "junk." (Dunn Depo. at 211-12; Wenninger Depo. at 95) Dunn, Wenninger and Penn testified that the vehicles outside had flat tires, were inoperable and looked like they had been there a long time. (Dunn Depo. at 184; Wenninger Depo. at 99; Penn Depo. at 104)

Dunn contacted Pat Horn, an expert in the use of cadaver dogs, to ensure that the cadaver dogs were being used properly. (Dunn Depo. at 66-67) Dunn also contacted Beth Maury, a professor at Mount St. Joe's College specializing in cadaver digs. (Id. at 37) Professor Maury indicated that the search was being conducted properly. (Id. at 37-38) Professor Maury advised Dunn to continue the search based on where cadaver dogs had hit, and suggested a few changes in how to search the dirt for evidence. (Id. at 93-94) Agent Greiger contacted FBI Special Agent Michael Hockrein, an expert and teacher of a course on body recovery. (Grieger Depo. at 87-88) Hockrein told Grieger that the search was being conducted properly, and that law enforcement just needed to "keep digging." (Id. at 87-88) Dunn also consulted with Tom Grenan, the Brown County Prosecutor, throughout the course of the dig. (Dunn Depo. at 97) Grenan repeatedly advised the law enforcement at the scene that the dig should continue based on hits from cadaver dogs and potential evidence found during the dig. (Id. at 96)

On May 8, 2004, Defendants and the FBI uncovered a shirt which the missing woman's family identified as the shirt she was wearing when she went missing. (Id. at 34-36) The cadaver dogs were brought back in to examine the location where the shirt was found. (Id. at 153)

When digging in the pole barn, a backhoe would bring a shovel of dirt to the surface, FBI agents would examine the dirt for any human remains or signs of a cadaver, and then

the dirt was moved outside of the garage.  (Id. at 42-43)  One day in early May of 2004, the hole inside the pole barn filled with water after a heavy rain.  (Id. at 75-76, 145)  After that, the hole kept filling with water, presumably due to a high water table.  (Id. at 75-76)  Defendants brought in water pumps so that they could continue with the search.  (Id. at 75-76)  To prevent the dirt under the pole barn from being contaminated from a nearby stream or underground spring, Defendants received permission from a neighbor to dig trenches on his property to ensure that water was not flowing onto the property from another location and contaminating the dirt.  (Wenninger Depo. at 89-90; Grieger Depo. at 43)

During the search, Defendants became concerned over the structural integrity of the garage.  Sheriff Wenninger, who had a background in construction, helped reinforce the frame of the garage.  (Wenninger Depo. at 53-54, 64-65; Dunn Depo. at 100)

After several days of digging inside of the garage, Defendants and the FBI ran out of space to put the dirt from inside the pole barn.  (Dunn Depo. at 183)  None of the law enforcement personnel had contemplated that the search would continue as long as it did, or that they would have to dig as deep and as expansively as they did. (Wenninger Depo. at 64-67)  As a result, the dirt and personal property removed from the pole barn was piled in such a way that Defendants were boxed in and had no room to pile extracted dirt.  (Dunn Depo. at 189; Wenninger Depo. at 64-67)

Dunn consulted with FBI Special Agent in Charge Jim Turgal, who advised Dunn that he had no choice but to pile dirt on top of some of personal property outside of the pole barn.  (Dunn Depo. at 183; Wenninger Depo. at 64-67).  Sheriff Wenninger approved of this plan.  (Dunn Depo. at 196)  Other areas of the property and neighboring properties

were not used for the extracted dirt because those areas were outside the scope of the search warrant.  (Wenninger Depo. at 46; Dunn Depo. at 192-93)  The Brown County Defendants claim that the Sheriff's Office did not have the manpower or monetary resources to store the dirt at a different site while maintaining the integrity of the search. (Dunn Depo. at 192-193; Wenninger Depo. at 67)  Dunn testified that Defendants knew that they were destroying the personal property by piling the dirt on it.  (Dunn Depo. at 184)  Defendants drove the "Bobcat" excavator over the mounds of dirt, which compacted the dirt surrounding the personal property.  (Wenninger Depo. at 48-49; Penn Depo. at 102; Doc. 97-4)  However, Plaintiffs contend that an aerial photograph shows that there was ample room on the two-acre property to move either personal property or extracted dirt. (Dunn Depo., Ex. 7)  In addition, Dunn testified that there was nothing prohibiting Penn from returning to Judge Zachman and requesting that the search warrant be expanded. (Id. at 193)

On May 10, 2004, Dunn and Sheriff Wenninger, after consulting with the other law enforcement personnel, decided to end the search because the cadaver dogs were no longer picking up any scents.  (Id. at 161-63)  The search ended on May 11, 2004.  (Dunn Depo. at 140-41; Wenninger Depo. at 100)  The search left a hole inside the pole barn as deep as fifteen feet.  (Dunn Depo. at 40-41; Doc. 97-4)  When Defendants left the property, they did not fill the hole in the pole barn, did not uncover the personal property buried in the dirt, or secure the personal property.  (Wenninger Depo. at 49)  Sheriff Wenninger knew that the hole in the pole barn would fill with rain and ground water unless the hole was backfilled with dirt, but was advised that law enforcement personnel were not

required to fill the hole.  (Wenninger Depo. at 52-53)[2]  A photograph of the inside of the pole barn from July 12, 2005 shows that the hole did indeed fill with water.  (Doc. 97-5)

Spangler did not go onto the property until August 15, 2004.  (Spangler Depo. (6/13/07) at 162)  Defendants maintain that Spangler was never prohibited by law enforcement from entering the Property.  (Penn Depo. at 213; Dunn Depo. at 227)  The tenants renting the house on the property moved out near the end of the search because the septic system was damaged.  (Spangler Depo. (6/13/07) at 45)  While the property was empty, vandals broke into the residence and stripped the residence of all personal property.  (Id. at 62)  Vandals also stole the personal property that had been placed outside the pole barn.  (Spangler Depo. (6/30/08) at 51-52)

In their Complaint, Plaintiffs bring claims under 42 U.S.C. § 1983 against Defendants Sheriff Wenninger, Sheriff Rodenberg, the Clermont County Board of Commissioners, and the Brown County Board of Commissioners based upon (1) an unreasonable search in violation of the Fourth Amendment and (2) a failure to investigate, discipline, or train.  (Doc. 1)  Plaintiff also brings state law claims of (1) destruction of real property; (2) destruction of personal property; (3) loss of rental income; (4) loss of use and enjoyment (personal and real property); (5) intentional infliction of emotional distress; and (6) willful and wanton misconduct.  (Id.)  The claims against Defendants Wenninger and Rodenberg are brought in both their individual and official capacities.  Plaintiffs also bring a breach of contract, bad faith and declaratory judgment claim against Defendant Ohio Fair

---

[2]Sheriff Wenniger recalls the FBI lead attorney having a discussion with Dunn and Brown County's prosecuting attorney and determining that the law enforcement personnel were not required to fill the hole.  (Wenninger Depo. at 100)

Plan Underwriting Association based upon its failure to pay Plaintiffs' claim under the insurance policy issued to them by Ohio Fair Plan Underwriting Association.[3]  (Id.)

## II.     ANALYSIS

### A.     Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact, but then the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita*, 475 U.S. at 587.  However, the nonmoving party may not rest on the mere allegations in the pleadings.  Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

### B.     Section 1983

Section 1983 creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere.  *Tuttle v. Oklahoma City*, 471 U.S. 808 (1985).  Section 1983 has two basic requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional rights.  *Flint v. Kentucky Dept. of Corrections*, 270 F.3d 340, 351 (6th Cir. 2001), *citing Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998)

---

[3]Defendant Ohio Fair Plan Underwriting Association has also filed a Motion for Summary Judgment (Doc. 80), which is the subject of a separate Order.

and *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 33 (6th Cir. 1992).[4]

Defendants concede that Plaintiff has shown state action. Therefore, the Court's analysis will focus on whether there is sufficient evidence of a constitutional violation.

## C. Qualified Immunity

Defendants argue that they are entitled to qualified immunity from Plaintiffs' section 1983 claims brought against them in their individual capacity.

The doctrine of qualified immunity protects government officials acting in their official capacities from damages if their actions did not "violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), *citing Procunier v. Navarette*, 434 U.S. 555, 565 (1978). Qualified immunity involves a two-step inquiry: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?;" (2) "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

---

[4]42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Plaintiffs claim that the search of their property violated the Fourth Amendment's prohibition of unreasonable seizures.[5]

However, before addressing the merits of Plaintiffs' constitutional claim, the Court finds it necessary to address against whom the claims are being brought. The Court denied Plaintiffs' motion to amend their Complaint to add Dunn and Penn as parties. Therefore, the only officers named in the Complaint are Sheriff Rodenberg and Sheriff Wenninger. However, liability under § 1983 cannot be based on the doctrine of *respondeat superior*, or the right to control employees. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999), *citing Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982). For supervisory liability to attach, a plaintiff must prove that the official "did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on." *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). A plaintiff must show that the official "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee*, 199 F.3d at 300.

Here, Plaintiffs have shown that Sheriff Wenninger directly participated in the search. Sheriff Wenninger was on site on six separate occasions and helped with the actual digging. Plaintiffs have also shown that Sheriff Rodenberg at least implicitly authorized the manner in which the search was conducted. Sheriff Rodenberg testified

---

[5]While Plaintiffs have implied in their Response and elsewhere that there was no probable cause for the search warrant, Plaintiffs have not brought such a claim in their Complaint. Therefore, the Court will not address the validity of the warrant obtained by Defendants.

that he had a "general" awareness of the search, and that on May 5, 2004 he spent about ninety minutes at the site to survey the progress of the search. Therefore, supervisory liability may attach to Sheriff Wenninger and Sheriff Rodenberg for the actions of their deputies.

The Fourth Amendment provides that "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. Amend. IV. As the Supreme Court has explained:

> The Amendment protects two distinct interests. The prohibition against unreasonable searches and the requirement that a warrant "particularly describ[e] the place to be searched" protect an interest in privacy. The prohibition against unreasonable seizures and the requirement that a warrant "particularly describ[e] . . . the . . . things to be seized" protect a possessory interest in property.

*Horton v. California*, 496 U.S. 128, 143 (1990) (Brennan, J., dissenting); *see also Texas v. Brown*, 460 U.S. 730, 747 (1983) (Stevens, J., concurring in judgment) ("The [Fourth] Amendment protects two different interests of the citizen-the interest in retaining possession of property and the interest in maintaining personal privacy. A seizure threatens the former, a search the latter."). Plaintiffs' claims are based upon a seizure affecting their possessory interests in property.

A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook County*, 113 S.Ct. 538, 543 (1992), *quoting United States v. Jacobsen*, 466 U.S. 109, 113 (1984). The Supreme Court has explained that the destruction of property is a "meaningful interference"

constituting a seizure under the Fourth Amendment. *Jacobsen*, 466 U.S. at 124-25; *see, e.g., Bonds v. Cox*, 20 F.3d 697, 701-02 (6th Cir. 1994) (holding that, under *Soldal*, damage to a house, including broken doors, mutilated vinyl siding, broken desks, and holes in walls, rises to the level of "meaningful interference" with one's possessory interests).

"[O]fficers executing search warrants must often damage property in order to perform their duty." *Hill v. McIntyre*, 884 F.2d 271, 278 (6th Cir. 1989), *citing Dalia v. United States*, 441 U.S. 238, 258 (1979). Yet, "the manner in which a warrant is executed is subject to later judicial review as to its reasonableness." *Dalia*, 441 U.S. at 258; *see also Bonds v. Cox*, 20 F.3d 697, 702 (6th Cir. 1994) (permitting plaintiff to assert her property damage claim under Fourth Amendment).

To determine the reasonableness of a search under the Fourth Amendment, a court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985), *quoting United States v. Place*, 462 U.S. 696, 703 (1983). Reasonableness depends upon "whether the totality of the circumstances justifie[s] a particular sort of search or seizure." *Id.* at 8-9.

Plaintiffs argue that the scope of the search was unreasonable. Specifically, Plaintiffs argue that the size and depth of the hole inside the pole barn was unreasonable. However, the Sixth Circuit has explained that "a search conducted pursuant to a lawful warrant may last as long, and be as thorough, as reasonably necessary to fully execute the warrant." *U.S. v. Keszthelyi*, 308 F.3d 557, 571 (6th Cir. 2002), *citing United States v. Jackson*, 120 F.3d 1226, 1228-29 (11th Cir. 1997). Accordingly, "law enforcement agents generally may continue to search the premises described in the warrant until they are

satisfied that all available evidence has been located." *Id.*, *citing United States v. Menon*, 24 F.3d 550, 560 (3d Cir. 1994) ("Any reasonable agent looking for evidence in a clearly circumscribed area would continue the search until she was certain that no more evidence existed which could not happen until the entire [area] was searched."). There is uncontroverted evidence that Defendants and the FBI continued the search as long as the cadaver dogs continued to pick up a scent. There is also evidence that Defendants consulted with experts on both the proper use of the cadaver dogs and the extent of the dig. There is no evidence that Defendants were ever advised that they should stop digging, yet continued to do so. Therefore, the Court concludes that there is no genuine issue of material fact as to whether the search was as long and thorough as reasonably necessary to fully execute the warrant. *Accord United States v. Becker*, 929 F.2d 442 (9th Cir. 1991) (finding reasonable search where officers executing search warrant on residence and adjacent shop noticed newly-poured concrete pad and used jackhammer to remove portions of slab; slab was located within area of search warrant and therefore "searching beneath it was clearly within the scope of the warrant.").

Plaintiffs also contend that the destruction of their property was not reasonable under the circumstances. Specifically, Plaintiffs point to the piling of dirt onto personal property and driving the Bobcat over the mounds of dirt covering the property.

In *Hill v. McIntyre*, the Sixth Circuit found that there was a factual issue as to the reasonableness of destruction of property by police officers during a search pursuant to a search warrant. 884 F.2d at 278. The court explained that "the standard is reasonableness, and in a § 1983 action the District Court must determine not whether destruction was 'reasonably necessary to effectively execute a search warrant' but whether

the plaintiff has raised factual issues to be submitted to a jury on this point." *Id.*, *citing Tarpley v. Greene*, 684 F.2d 1, 9 (D.C. Cir. 1982).  The court noted that there were photographs in evidence which show the home in a total disarray.  *Id.*  The court noted further that while the officers testified that the items were scattered about when they entered, the plaintiffs testified to the contrary.  *Id.*

Viewing the facts in a light most favorable to Plaintiffs, the Court finds that there is a genuine issue of material fact as to the reasonableness of the destruction of Plaintiffs' property.  While Defendants contend that they had no other choice than to pile the extracted dirt on the property located outside the pole barn, Plaintiffs have shown that there were other areas of the property where the dirt could have been relocated.  Plaintiffs have also shown that there was no reason that Penn could not request that the search warrant be expanded to allow either the personal property or the extracted dirt to be moved to another area.  Furthermore, photographs taken during the search and subsequent to the search show a large hole inside the pole barn.  Defendants have provided no practical explanation as to why the hole could not be filled, other than they were advised that they were not required to fill the hole after ending the search.  Accordingly, the Court finds that viewing the evidence in a light most favorable to Plaintiffs, Plaintiffs have shown that there is a genuine issue of material fact at to whether Sheriff Wenninger and Sheriff Rodenberg violated their Fourth Amendment right to be free from unreasonable searches.

Under the second prong of the qualified immunity analysis, this Court must determine whether the constitutional right in question was clearly established.  "In inquiring whether a constitutional right is clearly established, [the district court] must look first to the decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts

within [the Sixth Circuit], and finally to decisions of other circuits." *Champion v. Outlook Nashville, Inc*., 380 F.3d 893, 902 (6th Cir. 2004).

It has been clearly established since 1984 that the destruction of property may qualify as meaningful interference constituting a seizure under the Fourth Amendment. *Newsome v. Erwin*, 137 F.Supp.2d 934, 944 (S.D.Ohio 2000), *citing United States v. Jacobsen*, 466 U.S. 109, 113, 124 (1984).   Therefore, the Court finds that Sheriff Wenninger and Sheriff Rodenberg are not entitled to qualified immunity from Plaintiffs' Fourth Amendment claims brought against them in their individual capacity.

### D.    Liability of County

Plaintiffs have named the county commissioners of both Clermont and Brown County as Defendants.  Plaintiffs do not allege that the commissioners had any direct involvement in the search on the property.  As this Court has previously recognized, in actions brought pursuant to section 1983, the liability of supervisory personnel and government entities must be based on more than merely the right to control.  *Ridgeway v. Union County Com'rs*  775 F.Supp. 1105, 1110 (S.D.Ohio 1991).  Dismissal is proper where the plaintiff's claim against the county commissioners is based solely on the funding and administration of the county government.  *Id.*  Because there is no evidence that either the Clermont or Brown County Commissioners had any involvement in the search other than the right to control their respective sheriff's departments, these Defendants are entitled to summary judgment.

However, Plaintiffs have also brought suit against Sheriff Wenninger and Sheriff Rodenberg in their official capacity.  Suits against county officials in their official capacity should be treated as suits against the county.  *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th

Cir. 1994).

A county cannot be held liable under section 1983 for an injury inflicted solely by its employees or agents. *Gregory v. Shelby County, Tenn*., 220 F.3d 433, 441 (6th Cir. 2000), *citing Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978). For liability to attach, the plaintiff must establish that the municipality engaged in a "policy or custom" that was the "moving force" behind the deprivation of the plaintiff's rights. *Powers v. Hamilton County Public Defender Com'n*, 501 F.3d 592, 607, (6th Cir. 2007), *quoting Monell*, 436 U.S. at 694. Plaintiffs' claims against Sheriff Wenninger and Sheriff Rodenberg in their official capacity are based upon (1) a failure to investigate the incident and punish the responsible parties; and (2) a failure to train.

The Sixth Circuit has held that a failure to investigate complaints or discipline officers can give rise to § 1983 liability. *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1247 (6th Cir.1989), *cert. denied*, 495 U.S. 932 (1990); *Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir.1985), *cert. denied*, 480 U.S. 916 (1987); *see also Walker v. Norris*, 917 F.2d 1449, 1457 (6th Cir. 1990). The theory underlying these cases is that the municipality's failure to investigate or discipline amounts to a "ratification" of the officer's conduct. *Dyer v. Casey*, 1995 WL 712765, *2 (6th Cir. 1995).

To be liable under a ratification theory, the municipality's failure to investigate must be indicative of an official policy. *Morrison v. Board of Trustees of Green Tp.*, 529 F.Supp.2d 807, 825 (S.D.Ohio 2007). In other words, the post-injury failure to investigate a fact permits an inference that the misconduct which injured the plaintiff was pursuant to an official policy or custom. *Id.*, *quoting Tompkins v. Frost*, 655 F.Supp. 468 (E.D.Mich. 1987). Here, Plaintiffs have not shown that Sheriff Wenninger and Sheriff Rodenberg's

failure to investigate is indicative of an official policy. There is no indication that these sheriffs had a pattern of conducting searches in this manner. It would appear that this was a single instance. Therefore, Sheriff Rodenberg and Sheriff Wenninger are entitled to summary judgment on Plaintiffs' claim of failure to investigate or discipline.

Moving to Plaintiffs' second theory of liability, the Supreme Court has held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 397 (1997). A showing of simple or even heightened negligence will not suffice. *Stemler v. City of Florence*, 126 F.3d 856, 867 (6th Cir. 1997). The Supreme Court has identified at least two types of situations that would justify a conclusion of deliberate indifference in the failure to train police officers:

> One is failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction. For example, the Court indicated that the lack of instruction in the use of firearms or in the use of deadly force could constitute "deliberate indifference." A second type of situation justifying a conclusion of deliberate indifference is where the city fails to act in response to repeated complaints of constitutional violations by its officers.

*Games Galore of Ohio, Inc. vs. Masminster,* 154 F.Supp.2d 1292, 1300 (S.D. Ohio 2001) (citations omitted).

Plaintiffs have not shown that Sheriff Rodenberg or Sheriff Wenninger disregarded a known or obvious consequence with regards to the training their deputies received. Plaintiffs have not identified how the training was inadequate, nor have they shown that

Sheriff Rodenberg or Sheriff Wenninger failed to act in response to repeated complaints or constitutional violations by their deputies.   Therefore, the Court finds that Sheriff Rodenberg and Sheriff Wenniger are entitled to summary judgment on Plaintiffs' claim of failure to train.

###    E.    State law claims

Plaintiffs bring state law claims of (1) destruction of real property; (2) destruction of personal property; (3) loss of rental income; (4) loss of use and enjoyment (personal and real property); (5) intentional infliction of emotional distress; and (6) willful and wanton misconduct.  Defendants claim that they are entitled to immunity from these claims under Ohio Revised Code § 2744.01.

The Political Subdivision Tort Liability Act, as codified in Ohio Revised Code Chapter 2744,[6] requires a three-tiered analysis to determine whether a political subdivision should be allocated immunity from civil liability.  *Cater v. Cleveland*, 697 N.E.2d 610, 614 (Ohio 1998).  First, section 2744.02(A)(1) sets out a general rule that political subdivisions are not liable in damages.  *Greene Cty. Agricultural Soc. v. Liming*, 733 N.E.2d 1141, 1146

---

[6]This Court has held that the Liability Act violates the Ohio Constitution.  *Kammeyer v. City of Sharonville*, 311 F.Supp.2d 653, 662 (S.D.Ohio 2003).  However, other judges within this district have held that the provision is not violative of the Ohio constitution.  *See Webb v. Greene County Sheriff's Office*, 494 F.Supp.2d 779, 797 (S.D.Ohio 2007); *Samples v. Logan County*, 2006 WL 39265 (S.D.Ohio Jan. 6, 2006) (unpublished); *Grant v. Montgomery County Job & Family Servs.*, 2005 WL 2211266 (S.D.Ohio Sept. 8, 2005) (unpublished).  Moreover, the Sixth Circuit has found the Liability Act to be constitutional because a majority of the Supreme Court of Ohio has never held the statute unconstitutional and because Ohio's intermediate courts are unanimous in upholding the statute.  *Ellis v. Cleveland Mun. School Dist.*, 455 F.3d 690, 697 (6th Cir. 2006)  The Court finds the rationale of these opinions persuasive, and holds that the Liability Act does not violate the Ohio constitution.

(Ohio 2000).[7]  In setting out this rule, section 2744.02(A)(1) classifies the functions of political subdivisions into governmental and proprietary functions and states that the general rule of immunity is not absolute, but is limited by the provisions of Ohio Revised Code § 2744.02(B), which details when a political subdivision is not immune.  *Id.* Therefore, under the second tier of the analysis, it must be determined whether any of the exceptions in section 2744.02(B) apply.  *Id.*  If any of the exceptions are found to apply, the third tier of analysis becomes a consideration of the application of Ohio Revised Code § 2744.03.  *Id.*

There appears to be no dispute between the parties as to the first tier of the analysis.  However, the parties disagree under the second tier as to whether the exceptions under Ohio Revised Code § 2744.02(B) are applicable: (1) the negligent operation of any motor vehicle by political subdivisions employees on the public roads when the employees are engaged within the scope of their employment; (2) the negligent performance of acts by political subdivision employees with respect to proprietary functions of the subdivisions; (3) the subdivision's negligent failure to keep public roads in repair; (4) the negligence of the political subdivision employees that occurs within or on the grounds of, buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code; and (5) when liability is expressly imposed upon the political subdivision by

---

[7]Ohio Revised Code § 2744.02(A)(1) provides that "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."

a section of the Revised Code, including, but not limited to, sections 2743.02 and 5591.37 of the Revised Code.

The Court finds that Plaintiffs cannot rely upon the exceptions under section 2744.02(B) for their claim of intentional infliction of emotional distress because the Ohio Supreme Court has held that under the statute there are no exceptions to immunity for the intentional tort of intentional infliction of emotional distress. *Hubbard v. Canton City School Bd. of Edn.*, 780 N.E.2d 543, 546 (Ohio 2002), *quoting Wilson v. Stark Cty. Dept. of Human Serv.*, 639 N.E.2d 105, 107 (Ohio 1994); *see also Woods v. Miamisburg City Schools*, 254 F.Supp.2d 868, 880 (S.D.Ohio 2003) (explaining that Ohio courts have consistently held that political subdivisions, particularly those acting in a governmental capacity, are exempt from intentional tort claims, reasoning that Ohio Rev.Code § 2744.02(B) does not provide a specific exception for intentional torts). Therefore, Plaintiffs' intentional infliction of emotional distress claims against Sheriff Wenninger and Sheriff Rodenberg in their official capacity are barred by Ohio Revised Code § 2744.02(A)(1).

Plaintiffs argue that the second exception, found at Ohio Revised Code § 2744.02 (B)(2), applies because their claims are based upon Defendants' negligent training and supervision. Reading Plaintiffs' Complaint liberally enough to state a claim for negligence, the Court finds that the second exception is inapplicable. The exception is for the negligent performance of acts by political subdivision employees with respect to *proprietary* functions of the subdivisions. The execution of a search warrant cannot be classified as a proprietary function. *See Carter v. Karnes*, 2002 WL 31867893, at *3 (Ohio Ct. App. 2002) (unpublished) (explaining that when an alleged injury "was caused by acts committed by law enforcement officers in the course of their duties as law enforcement officers" the

actions are a governmental function). Therefore, Plaintiffs' negligence claims against Sheriff Wenninger and Sheriff Rodenberg in their official capacity are barred by Ohio Revised Code § 2744.02(A)(1).

However, Plaintiffs argue that section 2744.03(A)(6) applies to the claims against Sheriff Rodenberg and Sheriff Wenninger in their individual capacity.[8] *See Fabrey v. McDonald Village Police Dept.*, 639 N.E.2d 31, 35 (Ohio 1994) (explaining that section 2744.03(A)(6) by its very terms applies only to individual employees and not to political subdivisions). Section 2744.03(A)(6) provides: " . . . the employee is immune from liability unless one of the following applies . . . (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."

Generally, Ohio courts have held that the issue of whether a government employee acts with malice, bad faith, or in a wanton or reckless manner is a question for the jury. *Fabrey v. McDonald Village Police Dept.*, 639 N.E.2d 31, 35 (Ohio 1994); *Barrett v. Outlet Broadcasting, Inc.*, 22 F.Supp.2d 726, 750-51 (S.D.Ohio 1997). However, where the evidence in the record does not suggest a material factual issue on the question of whether

---

[8]As the District Court for the Northern District of Ohio has explained, Ohio case law is not settled as to whether a County Sheriff's Office, or the County Sheriff himself, should also be considered a political subdivision. *Shobe v. Seneca County Sheriff's Office*, 2008 WL 440582, *4 (N.D.Ohio Feb. 13, 2008) (slip op.), *citing Brothers v. County of Summit*, 2007 U.S. Dist. LEXIS 38468, at *73 n.13 (N.D.Ohio May 25, 2007) (unpublished) (noting that "Ohio's Tenth Appellate District has recognized the 'sheriff's department' as an extension of the 'county,' " while "Ohio's Twelfth District has accorded the 'Sheriff's Office' recognition as 'a body corporate and politic.' "). The court went on to explain that "[n]otwithstanding this confusion, federal courts in this District have held that "the sheriff [is] an employee of the political subdivision, *i.e.* the county." *Id.*, *citing* Ohio Rev.Code § 2744.01(B) (" 'Employee' includes any elected or appointed official of a political subdivision."); *Waggoner v. Carsey*, 716 N.E.2d 1225 (Ohio Ct. App. 1998); *Simpson v. White*, 1997 Ohio App. LEXIS 613, (Ohio Ct .App. Feb. 24, 1997) (unpublished); *Young v. Summit City*, 588 N.E.2d 169 (Ohio Ct. App. 1990).

the defendant's judgment or discretion was exercised with malicious purpose, bad faith, or in a wanton or reckless manner, summary judgment is appropriate. *Wamsley v. W. Jefferson*, 743 N.E.2d 442, 446 (Ohio Ct. App. 2000), *citing Marcum v. Talawanda City Schools*, 670 N.E.2d 1067, 1070-1071 (Ohio Ct. App. 1996).

The Ohio Supreme Court has held that " '[m]alicious' means 'indulging or exercising malice; harboring ill will or enmity.' " *Jackson v. Butler Cty. Bd. of Cty. Commrs.*, 602 N.E.2d 363, 367 (Ohio Ct. App. 1991), *quoting Teramano v. Teramano*, 216 N.E.2d 375, 377 (Ohio 1966). "Malice" has also been defined as the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified. *Id.*, *citing Bush v. Kelley's, Inc.*, 247 N.E.2d 745, 747-48 (Ohio 1969).

As to "bad faith," the Ohio Supreme Court has explained:

 . . . [B]ad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.

*Id.*, *citing Slater v. Motorists Mut. Ins. Co.*, 187 N.E.2d 45, 48 (Ohio 1962), *overruled on other grounds*, *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397 (Ohio 1994).

Finally, under Ohio law an individual acts in a "reckless" manner " 'if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.' " *Id.*, *quoting Thompson v. McNeill*, 559 N.E.2d 705, 708 (Ohio 1990), *quoting* 2 Restatement

of the Law 2d, Torts § 500 (1965); *see also Fabrey*, 639 N.E.2d at 35 (explaining that "wanton" conduct is "the complete failure to exercise any care whatsoever"). The Supreme Court has noted that since the term "reckless" is often used interchangeably with "willful" and "wanton," its comments regarding recklessness apply equally to conduct characterized as willful or wanton. *Id.*, *citing Thompson*, 559 N.E.2d at 708, n.1.

The Court finds that there is a genuine issue of material fact as to whether Sheriff Rodenberg and Sheriff Wenninger's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner. There is no dispute that Sheriff Wenninger intentionally piled dirt on Plaintiffs' personal property and drove the "Bobcat" excavator over the piles of dirt. Whether those acts were unlawful or unjustified is a question for the jury. Sheriff Rodenberg spent about ninety minutes surveying the site. Whether Sheriff Rodenberg was reckless by failing to prevent the dirt from being piled on the property is also a question for the jury. However, the Court finds, in keeping with its ruling on Plaintiffs' claims against Sheriff Rodenberg and Sheriff Wenninger under section 1983, there is no genuine issue of material fact as to whether there was any failure to investigate the incident, punish the responsible parties, or failure to train. Therefore, these alleged omissions cannot serve as a basis for an exception to immunity under section 2744.03(A)(6)(b).

Therefore, the Court finds that Sheriff Rodenberg and Sheriff Wenninger are not entitled to summary judgment on Plaintiffs' state law claims brought against them in their individual capacities.

## III. CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that:

1.  Defendants Clermont County Board of Commissioners, A.J. Rodenberg, Jr.'s Motion for Summary Judgment (Doc. 70) is **GRANTED in PART and DENIED in PART**;

    a.  The Motion is GRANTED to the extent that Defendant Clermont County Board of Commissioners is entitled to summary judgment and hereby dismissed as a party from this action;

    b.  The Motion is GRANTED to the extent that Defendants are entitled to summary judgment on Plaintiffs' claim of failure to investigate or discipline under section 1983;

    c.  The Motion is GRANTED to the extent that Sheriff Rodenberg is entitled to summary judgment on Plaintiffs' state law claims against him in his official capacity;

    d.  The Motion is DENIED to the extent that Sheriff Rodenberg is entitled to qualified immunity for Plaintiffs' Fourth Amendment claim brought against him in his individual capacity;

    e.  The Motion is DENIED to the extent that Sheriff Rodenberg is entitled to summary judgment on Plaintiffs' state law claims brought against him in his individual capacity; and

2.  Defendants Brown County Board of Commissioners, Dwayne Wenninger's Motion for Summary Judgment (Doc. 81) is **GRANTED in PART and DENIED in PART**

    a.  The Motion is GRANTED to the extent that Defendants Brown County Board of Commissioners is entitled to summary judgment and hereby dismissed as a party from this action;

    b.  The Motion is GRANTED to the extent that Defendants are entitled to summary judgment on Plaintiffs' claim of failure to investigate or discipline under section 1983;

    c.  The Motion is GRANTED to the extent that Sheriff Wenninger is entitled to summary judgment on Plaintiffs' state law claims against him in his official capacity;

    d.  The Motion is DENIED to the extent that Sheriff Wenninger is entitled to qualified immunity for Plaintiffs' Fourth Amendment claim brought against him in his individual capacity;

    e.  The Motion is DENIED to the extent that Sheriff Wenninger is entitled

to summary judgment on Plaintiffs' state law claims brought against him in his individual capacity.

**IT IS SO ORDERED.**

_/s/ Michael R. Barrett_____
Michael R. Barrett, Judge
United States District Court